**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| ENRIQUE EARNST, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ST. FRANCOIS COUNTY, )<br>ST. FRANCOIS COUNTY SHERIFF'S )<br>DEPARTMENT, and )<br>CHRISTOPHER CALLENDAR, )<br>KEVIN DAVIS, )<br>JEREMY REID, )<br>LAYNE HARRIS, and )<br>DANIEL DICUS, )<br>in their individual capacities. )<br>)<br>Defendants. ) | Cause No: 4:26-cv-00489-JMB<br><br>**Jury Trial Demanded** |

**FIRST AMENDED COMPLAINT**

1.      On May 7, 2025, St. Francois County Sheriffs Christopher Callendar, Kevin Davis, Jeremy Reid, Layne Harris, and Daniel Discus, as well as the St. Francois County Sheriff's Department, violated Enrique Earnst's rights under the Fourth Amendment, Fourteenth Amendment, the Americans with Disabilities Act (the "ADA") and Missouri law. Mr. Earnst, who had severe vision impairment and a history of grand-mal seizures, was walking to a nearby creek in mid-morning when the sheriffs swarmed him. Mr. Earnst repeatedly told the sheriffs that he was blind, and yet they forcibly arrested him and transported him to the St. Francois County jail, where he was needlessly maced twice and held long after the officers should have known they did not have cause to prolong his detention. Throughout, the Sheriff's Department failed to accommodate Mr. Earnst's disability. Mr. Earnst suffered pain, anxiety, and distress for months after the incident.

2.      Mr. Earnst brings this civil action pursuant to 42 U.S.C. § 1983 and the Fourth and

1

Fourteenth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act, and Missouri law. Plaintiff seeks in this civil action the vindication of his rights, a declaration that the Defendants' conduct was unlawful, and compensation for the conditions he endured during his arrest and detention by the St. Francois County Sheriff.

## JURISDICTION AND VENUE

3.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq*.

4.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

5.      Venue is proper under 28 U.S.C. § 1391(b) because all the events alleged herein occurred within the State of Missouri and all of the parties were residents of the State at the time of the events giving rise to this litigation.

6.      Divisional venue is proper in the Eastern Division because the incidents giving rise to the suit occurred entirely within the Eastern Division, and Plaintiff and Defendants resided in the Eastern Division at all times relevant. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

7.      Plaintiff demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b).

## PARTIES

8.      Mr. Earnst is a citizen of the United States and a resident of St. Francois County, Missouri.

9.      Defendant Deputy Jeremy Reid was at all times relevant herein an employee of the St. Francois County Sheriff's Department. Defendant Reid is a resident and citizen of the State of Missouri and was at all times relevant acting under the color of law. Defendant Reid is sued in his individual capacity.

10.     Defendant Corporal Christopher Callender was at all times relevant herein an

employee of the St. Francois County Sheriff's Department. Defendant Callender is a resident and citizen of the State of Missouri and was at all times relevant acting under the color of law. Defendant Callender is sued in his individual capacity.

11. Defendant Deputy Kevin Davis was at all times relevant herein an employee of the St. Francois County Sheriff's Department. Defendant Davis is a resident and citizen of the State of Missouri and was at all times relevant acting under the color of law. Defendant Davis is sued in his individual capacity.

12. Defendant Deputy Daniel Dicus was at all times relevant herein, an employee of the St. Francois County Sheriff's Department. Defendant Dicus is a resident and citizen of the State of Missouri and was at all times relevant acting under the color of law. Defendant Dicus is sued in his individual capacity.

13. Defendant Officer Layne Harris was at all times relevant herein an employee of the St. Francois County Sheriff's Department. Defendant Harris is a resident and citizen of the State of Missouri and was at all times relevant acting under the color of law. Defendant Harris is sued in his individual capacity.

14. Defendant St. Francois County Sheriff's Department, which is a "department, agency, special purpose district, or other instrumentality of a State or States or local government," is a "public entity" for purposes of the Americans with Disabilities Act. *See* 42 U.S.C. §§ 1231, 1232.

15. Defendant St. Francois County is a political subdivision of the State of Missouri. St. Francois County is a "department, agency, special purpose district, or other instrumentality of a State or States or local government" and thus is a "public entity" for purposes of the Americans with Disabilities Act. *See* 42 U.S.C. §§ 1231, 1232. St. Francois County was at all times mentioned

herein responsible for the actions, inactions, policies, procedures, practices, and training of the St. Francois County Sheriff's Department.

<b><u>FACTUAL ALLEGATIONS</u></b>

16.     Enrique Earnst is an individual with a disability.

17.     Mr. Earnst experienced substantial vision loss in his adult years.

18.     He lost all use of his right eye in a prior injury and wears a prosthetic eye.

19.     In his left eye, Mr. Earnst suffers from severe visual impairment.

20.     In the months prior to the May 2024, incident with the St. Francois County Sheriff's Department, Mr. Earnst received a diagnosis of 20/200 visual acuity, the criteria for legal blindness, in his left (and only) eye.

21.     In May 2024, Mr. Earnst struggled to identify shapes and could not make out the faces of people standing a couple feet away.

22.     Due to his diagnosis, Mr. Earnst relies on assistive devices to complete daily tasks, such as walking, reading, and utilizing a smart phone.

23.     Mr. Earnst experiences severe limitations in his ability to walk, communicate, and care for himself without his assistive devices.

24.     Even with the devices, Mr. Earnst requires assistance on many daily tasks, and his ability to see remained severely limited.

25.     For instance, Mr. Earnst often uses a white cane to help him ambulate and navigate spaces, but the white cane does not completely resolve his balance or steadiness on his feet.

26.     Following his vision loss, Mr. Earnst was also diagnosed with Charles Bonnet Syndrome, a condition in which the brain compensates for vision loss by producing silent visual hallucinations the sufferer knows are merely a neurological phenomenon.

4

27.    Additionally, Mr. Earnst has a history of grand mal seizures, for which he takes prescription medication.

28.    On May 7, 2024, at around 10:00 in the morning, Mr. Earnst decided to walk from the house he shares with his girlfriend to a nearby creek. It was a warm spring day, and he looked forward to spending time outdoors in nature.

29.    He wore flip-flops so he could wade into the creek.

30.    Mr. Earnst did not want to damage his white cane at the creek, so he used a wooden walking stick to navigate his path, just as he would his white cane.

31.    Mr. Earnst started walking the quarter-mile stretch along Highway D between his house and the creek.

32.    In that area, Highway D is a two-lane road without sidewalks.

33.    Mr. Earnst tried to walk along the grassy area bordering the road, but his disability made it risky and effortful for him to balance on its sloped surface.

34.    Instead, he chose the safer option: the edge of the road.

35.    When Mr. Earnst was nearly at the creek, a St. Francois County Sheriff's cruiser, operated by Deputy Reid and Corporal Callender, pulled up to Mr. Earnst's side.

36.    The sheriffs alleged that someone had called for a wellness check on Mr. Earnst.

37.    Mr. Earnst told the sheriffs that he was fine, did not need assistance, and was heading to the creek.

38.    Mr. Earnst also told the sheriffs he was blind.

39.    As Mr. Earnst spoke to the sheriffs, he was still holding his stick and deploying it as he would a white cane.

40.    Sheriffs Reid and Callendar told Mr. Earnst that he was "faking" being blind.

5

41. The sheriffs demanded that Mr. Earnst identify himself, and Mr. Earnst said that he was just walking to the creek and did not need to identify himself.

42. Mr. Earnst asked the sheriffs to tell him their names and badge numbers, but they refused. At no point during the course of the day did Mr. Earnst learn the sheriffs' names.

43. Mr. Earnst told the sheriffs his first name.

44. Soon after, a second cruiser, operated by Deputy Davis, arrived.

45. Because Mr. Earnst was close to his home, his girlfriend noticed the cruisers, and she walked over to where Mr. Earnst and the officers were standing.

46. Mr. Earnst's girlfriend told the officers that Mr. Earnst was blind.

47. The sheriffs told his girlfriend they did not believe Mr. Earnst was blind.

48. Without warning, and without telling Mr. Earnst he was under arrest, sheriffs Reid and Callender wrenched Mr. Earnst's arms behind his back, knocked the walking stick out of his hand, and handcuffed Mr. Earnst.

49. At no point prior to or during the handcuffing did Mr. Earnst physically resist or pose any threat to the sheriffs, himself, or anyone else.

50. The sheriffs' use of force, removal of Mr. Earnst's assistive device, and application of handcuffs caused Mr. Earnst to lose his balance, fall onto the ground, tumble down the incline, and land in a ditch on the side of the road.

51. Mr. Earnst began having a seizure.

52. The seizure caused Mr. Earnst's body to violently convulse and his limbs to smack against the ground.

53. It was plainly obvious that Mr. Earnst was having a seizure. But, in addition, Mr. Earnst's girlfriend told the sheriffs, who were standing and observing Mr. Earnst, that he was

6

having a seizure, and she asked that they transport him to the hospital for medical care.

54.     Sheriffs Reid, Callendar, and Davis refused to offer medical attention or to take Mr. Earnst to the hospital.

55.     As Mr. Earnst continued seizing, sheriffs Reid, Callendar, and Davis picked him up and threw him prone into one of the patrol cars.

56.     Instead of taking Mr. Earnst to the hospital, the sheriffs transported him to St. Francois County Jail.

57.     Mr. Earnst's seizure ended while he was in the back of the sheriff's vehicle and was alert by the time he arrived at the St. Francois County Jail.

58.     At no point did sheriff Reid, Callendar, or Davis inform Mr. Earnst why he was under arrest. Later, Deputy Reid would write in an "arrest summary" that Mr. Earnst was "taken to the jail and placed on a 12-hour safe-keeping per RSMo 67.315."

59.     Missouri Revised Statute Section 67.315 states: "A person who appears to be incapacitated or intoxicated may be taken by a police officer to the person's residence, to any available treatment service, or to any other appropriate local facility, which may if necessary include a jail, for custody not to exceed twelve hours."

60.     Mr. Earnst was not intoxicated on the morning of May 7, 2024.

61.     Mr. Earnst had not consumed any alcohol or other substances prior to his 10 a.m. walk to the creek.

62.     The arrest summary makes no mention of Mr. Earnst's disability, medical conditions, or need for immediate care.

63.     Instead, the arrest summary incorrectly describes Mr. Earnst's seizure as him "kicking toward all officers on scene," when in reality Mr. Earnst was having a seizure.

7

64.    As the sheriff's cruiser pulled into the sallyport at the St. Francois County Jail, no fewer than eleven sheriffs swarmed the vehicle. The County Sheriff stood nearby, watching.

65.    Two sheriffs forcefully yanked Mr. Earnst out of the rear right door, dragging him by his arms.

66.    Mr. Earnst grimaced in pain and struggled to get his footing or stand upright after the officers yanked him out of the car.

67.    Mr. Earnst was still handcuffed and deprived of any assistive device for walking.

68.    Mr. Earnst had by that point also lost his flip-flops and was barefoot.

69.    He remained barefoot for the rest of his time at the jail.

70.    Shortly after Mr. Earnst arrived at the jail, his girlfriend called the jail and explained to a sheriff Mr. Earnst's medical conditions, including his blindness and his seizure. She asked that the Sheriff's Department take him to the hospital for care. The sheriff responded, "We are going to run our jail our way."

71.    Jail records stated that Mr. Earnst was "cleared by medical," but this clearance amounted to little more than a jail staff member looking at Mr. Earnst outside a booking cell for less than thirty seconds and poking him twice in the back before walking away.

72.    After the encounter with the jail staffer, Sheriffs Harris and Dicus approached Mr. Earnst, and Mr. Earnst told them that he was blind and had not done anything wrong.

73.    Sheriffs Harris and Dicus responded that they did not believe he was blind and refused to engage any further with Mr. Earnst about his disabilities.

74.    Sheriffs Harris and Dicus did not do any further investigation to ensure that Mr. Earnst's disability was accommodated during his detention.

75.    A sheriff then escorted Mr. Earnst into an unoccupied cell and removed his

8

handcuffs.

76.     Video footage from the cell captures Mr. Earnst waving his hands trying to locate a wall to hold and get his bearings.

77.     The sheriff exited the cell, closed the door, and left Mr. Earnst alone.

78.     Mr. Earnst sat for a few minutes before slowly finding his way back to a window that looked from the holding cell into the lobby.

79.     At that time, five sheriffs stood in the lobby.

80.     Mr. Earnst did not know why he was detained.

81.     He also was worrying about the seizure and was in pain from the force used at his arrest, so he wanted to talk to a sheriff about seeing a medical provider.

82.     Mr. Earnst banged on the window several times attempting to get a sheriff's attention and stated that he needed medical attention.

83.     The sheriffs continued milling about the lobby, sometimes staring at Mr. Earnst, and other times laughing at him through the window, but mostly ignoring him.

84.     Mr. Earnst, alone in a locked cell, posed no threat to himself, the officers, or other detainees.

85.     Mr. Earnst was barefoot, without his mobility aids, and in pain.

86.     He had no objects in his hands, did not damage property or threaten to damage property. He did not threaten to harm himself or anyone else.

87.     After two minutes of asking for medical attention with no response, Mr. Earnst banged on his window three more times.

88.     Without warning, Sheriff Harris reached his arm through the chuckhole of Mr. Earnst's cell door, reached his arm close to Mr. Earnst's face, and sprayed Mr. Earnst with

9

Oleoresin Capsicum (OC spray) directly in the face from close range.

89.     Sheriff Harris told Mr. Earnst, "You ain't blind, quit faking it."

90.     Sheriff Dicus then immediately approached Mr. Earnst's cell and placed a rolled towel at the bottom of the cell door, intentionally preventing the OC spray from dissipating in Mr. Earnst's cell and limiting the amount of clean air from entering the cell, putting Mr. Earnst at increased risk of harm.

91.     The OC spray caused Mr. Earnst to struggle to breathe, impaired his vision, caused his eye, face, and chest to burn, and left him in pain for days.

92.     Given Mr. Earnst's visual impairment and lack of assistive device, he struggled to locate the sink in his cell to wash off the OC spray.

93.     The small amount of water Mr. Earnst could pump from the sink did not alleviate the burning sensation, pain, or other symptoms.

94.     Mr. Earnst lay on the cell floor by the toilet for nearly an hour in severe pain.

95.     Five sheriffs then entered Mr. Earnst's cell, dragged him on his back to the center, then forcibly rolled him over.

96.     The sheriffs wanted Mr. Earnst to stand up, but he struggled to get his bearings among the frantic movement. Once he was upright, the sheriffs escorted Mr. Earnst to a holding cell on the other side of the lobby.

97.     Once Mr. Earnst was in the doorway of a new cell, three sheriffs simultaneously and forcibly shoved him inside, causing Mr. Earnst to tumble and nearly fall.

98.     The sheriffs closed the door, again leaving Mr. Earnst alone in a locked and unfamiliar cell.

99.     Mr. Earnst returned to the cell door and, still determined to see a doctor and learn

10

why he was still detained, began knocking on the door. At no point was he taken to the doctor. At no point did anyone tell him why he was detained.

100.    Eventually, the sheriffs took Mr. Earnst to the shower, allegedly to wash off the OC spray.

101.    But, without Mr. Earnst being able to see what they were doing, the sheriffs intentionally ran the water to a scalding temperature.

102.    The sheriffs knew or should have known that the scalding was too hot for any person, but especially for someone who had recently been sprayed because such hot water intensifies—and does not relieve—the OC spray's effect.

103.    The sheriffs then maneuvered Mr. Earnst into the scalding water.

104.    The water, compounded by the OC spray, caused Mr. Earnst's skin to burn, and he experienced significant pain and discomfort.

105.    By 1:00 p.m., Enrique had been moved to a third cell. Again, the cell was locked and he was alone inside.

106.    Around 1:10 p.m., he knocked on the cell window, trying to get the attention of the sheriffs. Sheriffs in the lobby joked around with other detainees, even going so far as to dance with other detainees.

107.    A sheriff in the lobby continued to ignore Mr. Earnst and ate a snack.

108.    A sheriff then opened Mr. Earnst's cell door, stood near the open door, and had a calm conversation during which Mr. Earnst stood still and told the sheriff that his eyes were burning and he was in pain from the seizure. Mr. Earnst requested that the sheriff call his girlfriend for help or get him medical attention.

109.    At no point in that conversation did Mr. Earnst make threatening movements,

11

attempt to evade the sheriff, flee his cell, or threaten to harm a person or property.

110.    The sheriff did not provide medical attention or help Mr. Earnst call his girlfriend. Nor did he provide Mr. Earnst with information about the basis for his detention.

111.    The sheriff left Mr. Earnst's cell, closed the cell door, and Mr. Earnst continued to stay at the window to try and get medical help and information about his arrest.

112.    At that time, neither Sheriff Harris nor Sheriff Dicus had spoken to Mr. Earnst for at least twenty-five minutes.

113.    And yet, at 1:22 p.m., without warning, Sheriffs Harris and Dicus approached Mr. Earnst's cell: Sheriff Dicus opened the door and Sheriff Harris again deployed OC spray directly into Mr. Earnst's face from close range.

114.    Mr. Earnst's eye stung, his skin burned, and he experienced severe pain and difficulty breathing.

115.    Sheriff Dicus approved, ordered, or encouraged Sheriff Harris to deploy OC spray.

116.    Although Mr. Earnst was in physical and mental distress, he ceased his requests for medical help, for fear he would endure further punishment and harm by the sheriffs.

117.    Around 10:25 p.m., Mr. Earnst was released. On the way out, the officers intentionally led Mr. Earnst, who was still without any mobility aid, into a door frame, causing him to hit his head.

118.    No charges were ever filed against Mr. Earnst.

119.    Mr. Earnst continues to feel pain, suffering, anxiety, distress, and humiliation.

## CLAIMS FOR RELIEF

### COUNT I
**Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983**
**(Against Defendant Sheriffs Dicus and Harris)**

12

120.    Plaintiff incorporates by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

121.    Defendants Dicus and Harris purposely or knowingly used chemical agents against Mr. Earnst on two occasions.

122.    During both uses of chemical agents against Mr. Earnst, he was severely visually impaired, barefoot, and had recently suffered a seizure.

123.    During both uses of chemical agents, Mr. Earnst had been requesting medical care in light of his disabilities and had been seeking any information about why he had been arrested.

124.    During both uses of chemical agents against Mr. Earnst, Mr. Earnst was alone in a locked cell, did not threaten Defendants or anyone else, did not physically resist the Defendants, and posed no safety or security threat.

125.    And, immediately preceding the second use of chemical agents, Mr. Earnst and another officer had a calm conversation, further demonstrating Mr. Earnst posed no threat.

126.    Defendants Dicus and Harris' use of chemical agents on Mr. Earnst was objectively unreasonable and in violation of Mr. Earnst's clearly established Fourteenth Amendment rights.

127.    The circumstances under which Defendants used chemical agents against Mr. Earnst were not rationally related to a legitimate governmental purpose, or alternatively, were excessive in relation to any legitimate government purpose.

128.    Defendants' actions were the direct and proximate cause of the violations of Mr. Earnst's constitutional rights and harms suffered by Mr. Earnst, including bodily pain, suffering, apprehension, anxiety, and emotional distress.

129.    The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Mr. Earnst, entitling him to an award of punitive damages against the

13

Defendants.

130.    If Mr. Earnst prevails, he is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988 *et seq*.

**COUNT II**

**Unlawful Seizure in Violation of the Fourth Amendment under 42 U.S.C. § 1983**
**(Against Defendants Collander, Reid, and Daniels)**

131.    Mr. Earnst incorporates all preceding paragraphs as if fully set forth in this Count.

132.    Defendants purported to arrest Mr. Earnst due to being intoxicated, but Mr. Earnst was not intoxicated at 10:00 in the morning as he walked to the creek.

133.    Nor did Mr. Earnst commit any other unlawful conduct such that the Defendants had arguable probable cause or probable cause to arrest him.

134.    Defendants Collander, Reid, and Daniels seized Mr. Earnst without probable or arguable probable cause, depriving him of his right to be free from unreasonable seizures.

135.    As a direct result of the conduct of Defendants Collander, Reid, and Daniels, Mr. Earnst endured pain, humiliation, emotional distress, and anxiety.

136.    Defendants Collander, Reid, and Daniels engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to Mr. Earnst's Fourth Amendment rights.

137.    Defendants Collander, Reid, and Daniels' actions, as described above, were intentional, wanton, malicious, oppressive, reckless, and callously indifferent to the rights of Mr. Earnst, entitling Mr. Earnst to an award of punitive damages.

138.    If Mr. Earnst prevails, he is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988 *et seq*.

**COUNT III**

**Unlawful Continued Detention in Violation of the Fourth Amendment under**

## 42 U.S.C. § 1983
### (Against Defendants Harris and Dicus)

139.   Mr. Earnst incorporates all preceding paragraphs as if fully set forth in this Count.

140.   Mr. Earnst was allegedly brought to the St. Francois County Jail pursuant to a Missouri statute that permits the temporary detention of someone who "appears to be incapacitated or intoxicated."

141.   Mr. Earnst was not incapacitated or intoxicated, and Defendant officers had discriminated against Mr. Earnst by interpreting manifestations of his disability as intoxication.

142.   Defendants Harris and Dicus spoke with Mr. Earnst within the first few minutes of his detention, immediately after the jail staff member medically "cleared" Mr. Earnst.

143.   Mr. Earnst informed Defendants Harris and Dicus that he was blind and had not done anything wrong.

144.   Defendants Harris and Dicus further personally observed Mr. Earnst struggle with his balance and with navigating the space due to his vision limitations.

145.   Defendants Harris and Dicus also personally observed that Mr. Earnst was wearing a prosthetic eye.

146.   A reasonable officer would have been able to ascertain that Mr. Earnst was not intoxicated or incapacitated, and that there was no reasonable basis for his custodial hold.

147.   A reasonable officer would have released Mr. Earnst immediately upon realizing there was no basis for his arrest or detention.

148.   Despite this, Defendants Dicus and Harris continued to detain Mr. Earnst for nearly twelve hours, during which time he was needlessly and repeatedly maced and harmed, in violation of his Fourth Amendment rights.

149.   Defendants Dicus and Harris did not make any effort to release Mr. Earnst despite

15

there being no basis for his continued detention.

150.    Defendants' actions were the direct and proximate cause of the violations of Mr. Earnst's constitutional rights and damages suffered by Mr. Earnst, including pain, suffering, and emotional distress.

151.    Defendants Harris and Dicus' actions, as described above, were intentional, wanton, malicious, oppressive, reckless, and callously indifferent to the rights of Mr. Earnst, entitling Mr. Earnst to an award of punitive damages.

152.    If Mr. Earnst prevails, he is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988 *et seq*.

## COUNT IV
**Wrongful Arrest in Violation of Title II of the Americans with Disabilities Act under 42 U.S.C. § 12131**
**(Against Defendants St. Francois County Sheriff's Department and St. Francois County)**

153.    Mr. Earnst incorporates all preceding paragraphs as if fully set forth in this Count.

154.    The St. Francois County Sheriff's Department is a "public entity" as defined under 42 U.S.C. § 12131(1)(A).

155.    The St. Francois County Sheriff's Department is the entity that operates the St. Francois County Jail.

156.    "A local police department falls 'squarely within the definition of 'public entity'" for purposes of Title II of the ADA. *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (citing *Penn. Dep't of Corrs. v. Yeskey*, 524 U.S. 206 (1998)); *see also Cox v. Callaway Cnty. Sheriff's Dep't*, No. 18-cv-0405-KNL, 2019 WL 1049389, at *2 n.2 (W.D. Mo. March 5, 2019) ("There is no dispute that Callaway County jail is a 'public entity' to which Title II of the ADA applies.").

157.    Alternatively, St. Francois County Sheriff's Department is a division of St. Francois County and St. Francois County is the suable entity.

16

158.    St. Francois County is also a "public entity" as defined under 42 U.S.C. § 12131(1)(A).

159.    Mr. Earnst was disabled, within the meaning of 42 U.S.C. § 12102(1) and 28 C.F.R. § 35.108, at all times relevant.

160.    Mr. Earnst is a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104.

161.    Specifically, Mr. Earnst suffers from multiple medical conditions, including severe visual impairment, Charles Bonnett syndrome, and a history of grand mal seizures, which substantially affect his major life activities such as seeing, communicating, reading, walking, working, using a phone or computer, and caring for himself.

162.    Defendants have not fulfilled their affirmative obligation to reasonably accommodate people with disabilities in their arrest processes.

163.    Defendants have no policy or practice requiring sheriffs to ensure that people are not wrongfully arrested for lawful conduct arising out of their disability.

164.    Defendants do not have a policy or practice instructing consideration of a disability before arresting someone for lawful conduct.

165.    Mr. Earnst told St. Francois County sheriffs prior to the arrest that he was blind and did not need help, and then he began seizing.

166.    Mr. Earnst did not engage in any unlawful activity that would otherwise justify his arrest or continued detention.

167.    A reasonable officer would have known that Mr. Earnst was not intoxicated but blind.

168.    A reasonable officer would have known that Mr. Earnst was not "kicking" toward

17

the officers, as the arrest summary suggests, but seizing.

169. Nonetheless, the officers wrongfully arrested Mr. Earnst for lawful conduct associated with his disability.

170. The ADA's "legislative history discusses arrests of handicapped individuals" and "evinces a concern that disability-related conduct (e.g., an epileptic seizure) is confused with criminal activity, leading to the arrest of the disabled individual." *Gorman v. Bartch*, 925 F. Supp. 3d 653, 656 (W.D. Mo. 1996), reversed in part and on other grounds by *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), (citing H.R. Rep. No. 485(III), 101st Cong., 2d Sess. 50).

171. Such an arrest amounts to "a situation . . . wherein a person was arrested because of his disability[,]" and violates a person's rights under the ADA. *Id.*

172. Defendants failed to fulfill their affirmative obligations to ensure that disabled persons' lawful conduct is not erroneously perceived as illegal activity.

173. Defendants discriminated against Mr. Earnst when the officials wrongfully arrested Mr. Earnst because of this erroneous perception.

174. The officers' discrimination resulted in Mr. Earnst's prolonged detention.

175. Mr. Earnst and his girlfriend alerted St. Francois County on multiple occasions that Mr. Earnst was disabled, in that he was blind and suffered from seizures, and yet Defendants had instituted no practice to address the likelihood that such an arrest and prolonged detention would violate Mr. Earnst's federal rights.

176. Officers from St. Francois County also observed Mr. Earnst wearing a prosthetic eye, utilizing a walking stick, having a seizure, struggling to navigate his cell due to vision limitations, and struggling to catch his balance, and therefore were on notice that his vision was severely impaired and that he suffered seizures, and yet Defendants had no practice, training, or

18

policy in place such that its officers could address the likelihood that the arrest and continued detention violated Mr. Earnst's federal rights.

177.    The wrongful arrest and continued detention of Mr. Earnst directly resulted from Defendants' failure to have any practice to ensure they are not arresting people for lawful conduct arising out of their disability.

178.    Defendants' conduct amounts to deliberate indifference to Mr. Earnst's disability.

179.    Defendants' conduct resulted in Mr. Earnst being denied the services and benefits of the sheriff's department.

180.    As a direct and proximate result of these violations of the ADA, Mr. Earnst's right to be free from discrimination on the basis of his disability was denied.

181.    If Mr. Earnst prevails, he is entitled to attorneys' fees pursuant to 42 U.S.C. § 1205.

## COUNT V

**Failure to Provide a Reasonable Accommodation in Violation of Title II of the Americans with Disabilities Act Under 42 U.S.C. § 12131**
**(Against Defendants St. Francois County Sheriff's Department and St. Francois County)**

182.    Mr. Earnst incorporates all preceding paragraphs as if fully set forth in this Count.

183.    Use of force practices and policies at St. Francois County Jail are programs, services, or activities within the scope of the ADA. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

184.    Defendants have not fulfilled their affirmative obligation to reasonably accommodate people with disabilities who are detained at St. Francois County Jail.

185.    Defendants have no policy or practice requiring jail staff to conduct medical condition inquiries before a planned use of force involving chemical agents to determine whether an individual's medical condition counsels against the use of chemical agents, nor does it have any

19

practice or policy instructing the accommodation of a person's disability before using chemical agents.

186. Defendants had reason to know that failing to accommodate a blind person by deploying chemical agents at close range in their face would result in serious harm.

187. Defendants were aware of Mr. Earnst's disabilities, in that he told St. Francois County Sheriffs both at the scene of the arrest and again when he arrived in the jail of his disabilities. Additionally, Mr. Earnst's girlfriend told the officers that he was seizing, blind, and needed medical attention for both.

188. Defendants nonetheless deployed chemical agents against Mr. Earnst without even attempting to reasonably accommodate his disability.

189. Defendants subjected Mr. Earnst to discrimination by failing to provide reasonable accommodations in its use of force involving chemical agents.

190. Defendants' conduct amounts to deliberate indifference.

191. The failure to provide reasonable accommodations results in discrimination which violates 42 U.S.C. § 12131 and 28 C.F.R. § 35.130(b)(7)(i).

192. If Mr. Earnst prevails, he is entitled to attorneys' fees pursuant to 42 U.S.C. § 1205.

**COUNT VI**
**As-Applied Challenge to the Application of**
**Section 67.315 of the Missouri Revised Statutes to Mr. Earnst,**
**in Violation of the Fourteenth Amendment's Procedural and Substantive Due Process**
**under 42 U.S.C. § 1983**
**(Against Defendants Reid, Davis, and Callendar)**

193. Mr. Earnst incorporates all preceding paragraphs as if fully set forth in this Count.

194. Section 67.315 of the Missouri Revised Statute provides: "[A] person who appears to be incapacitated or intoxicated may be taken by a peace officer to the person's residence, to any available treatment service, or to any other appropriate local facility, which may if necessary

20

include a jail, for custody not to exceed twelve hours."

195. The statute does not define "incapacitated" or "intoxicated."

196. The statute does not provide any objective benchmark by which a peace officer may assess whether a person "appears to be incapacitated or intoxicated," and it fails to establish any minimal guideline to govern law enforcement officers in the application of this statute.

197. The statute's vague enforcement standard vested virtually complete discretion in the hands of Defendants Davis, Reid, and Callendar to determine whether Mr. Earnst satisfied the statute.

198. The statute was not written with sufficient definiteness such that Mr. Earnst could understand that conduct arising out of his disability could be construed as prohibited.

199. The statute is so broad and vague that it fails to give Mr. Earnst fair notice of whether his walking could result in law enforcement identifying him as a person violating the statute.

200. The vagueness of the statute resulted in it being arbitrarily applied to Mr. Earnst.

201. As applied to Mr. Earnst, the statute—which resulted in his arrest, detention, and subjection to force—violated his procedural due process rights.

202. And application of the statute against Mr. Earnst also resulted in his arbitrary detention in the St. Francois County Jail in violation of his substantive due process rights.

203. The right to be free from arbitrary detention is objectively and deeply rooted in this nation's history and tradition.

204. The right to be free from arbitrary detention is implicit in the concept of ordered liberty.

205. Mr. Earnst presented no danger to himself or others at the time he was walking to

the creek and was stopped and seized by the Defendant Officers.

206.    Defendants Officers' conduct was conscience-shocking, in that they forcibly arrested and detained Mr. Earnst, ignoring his implorations that he was blind and merely walking to the creek.

207.    Such a response was severe and disproportionate to the need presented and represents a striking abuse of official power. As applied to Mr. Earnst, the statute resulted in his arrest and detention and violated his substantive due process rights.

208.    The officers had no reasonable grounds to believe Mr. Earnst was incapacitated or intoxicated, and yet they used excessive force to detain Mr. Earnst.

209.    If Mr. Earnst prevails, he is entitled to attorneys' fees pursuant to 42 U.S.C. § 1988 *et seq*.

## COUNT VII
### Battery in Violation of Missouri State Law
### (Against Defendants Dicus and Harris)

210.    Mr. Earnst incorporates all preceding paragraphs as if fully set forth in this count.

211.    Defendants Harris and Dicus intended the conduct discussed more fully above to cause physical contact with Mr. Earnst.

212.    The physical contact that Defendants Harris and Discus caused was offensive and harmful to Mr. Earnst.

213.    The sheriffs made this contact with no legal justification.

214.    Defendants Harris and Dicus committed battery with bad faith or malice in that the Defendants acted contrary to their duty, intended to be prejudicial to Mr. Earnst, and had actual intent to cause injury.

215.    As a direct and proximate result of Defendants' unlawful conduct, Mr. Earnst

22

suffered physical pain and emotional distress.

## COUNT VIII
### False Imprisonment in Violation of Missouri State Law
### (Against Defendants Reid, Davis, and Callander)

216.    Mr. Earnst incorporates all preceding paragraphs as if fully set forth in this Count.

217.    Mr. Earnst was restrained against his will when Defendants Reid, Daniels, and Callender wrongfully arrested and jailed Mr. Earnst.

218.    The restraint was unlawful in that Mr. Earnst was arrested without cause or legal justification.

219.    Defendants Reid, Daniels, and Callender intended to cause this false arrest.

220.    As a result of Defendants Reid, Daniels, and Callendar's false arrest, Mr. Earnst was injured.

221.    Defendants Reid, Daniels, and Callender committed the false arrest with bad faith or with malice in that the Defendants acted contrary to their duty, intended to be prejudicial to Mr. Earnst, and had actual intent to cause injury.

222.    As a direct and proximate result of Defendants' unlawful conduct, Mr. Earnst experienced suffering and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff Enrique Earnst requests the following relief from this Court:

A. Enter judgment in Mr. Earnst's favor and against Count I Defendants, including:

    i.    Award him compensatory damages;

    ii.    Award him punitive damages; and

    iii.    Award his costs, including reasonable attorneys' fees under 42 U.S.C. §

1988 and other relevant provisions of law.

B.  Enter judgment in Mr. Earnst's favor and against Count II Defendants, including:

    i.    Award him compensatory damages;

    ii.    Award him punitive damages; and

    iii.    Award his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and other relevant provisions of law.

C.  Enter judgment in Mr. Earnst's favor and against Count III Defendants, including:

    i.    Award him compensatory damages;

    ii.    Award him punitive damages; and

    iii.    Award his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and other relevant provisions of law.

D.  Enter judgment in Mr. Earnst's favor and against Count IV Defendants, including:

    i.    Award him compensatory damages; and

    ii.    Award his costs, including reasonable attorneys' fees under 42 U.S.C. § 1205.

E.  Enter judgment in Mr. Earnst's favor and against Count V Defendants, including:

    i.    Award him compensatory damages; and

    ii.    Award his costs, including reasonable attorneys' fees under 42 U.S.C. § 1205.

F.  Enter judgment in Mr. Earnst's favor and against Count VI Defendants,

including:

i.  Award him compensatory damages; and

ii.  Award his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and other relevant provisions of law.

G.  Enter judgment in Enrique Earnst's favor and against Count VII Defendants, including awarding of compensatory damages.

H.  Enter judgment in Enrique Earnst's favor and against Count VIII Defendants, including awarding of compensatory damages; and

I.  For such other and further relief as this Court deems just and proper.


Dated: June 18, 2026                    Respectfully submitted,

ARCHCITY DEFENDERS, INC.

/s/ Brianna Coppersmith
Brianna Coppersmith, #75515MO
Maureen Hanlon, #70990MO
5939 Goodfellow Blvd.
Saint Louis, MO 63147
314-891-5663
314-925-1307 (fax)
bcoppersmith@archcitydefenders.org

*Attorneys for Plaintiff*